**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**ALICE A. FRAME,**

      **Plaintiff,**

**vs.**                           **Case No.  1:12-CV-162-MP/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Commissioner of the Social Security Administration

(SSA) denying Plaintiff's Title II application for period of disability and Disability

Insurance Benefits (DIB) and Title XVI application for Supplemental Security Income

(SSI) .  After careful consideration of the entire Record, it is respectfully recommended

that the decision of the Commissioner be affirmed.

**I.  Procedural History of the Case**

On July 24, 2006, Plaintiff, Alice A. Frame, filed a Title II application for a period

of disability and DIB and a Title XVI application for SSI alleging disability beginning May

31, 2006.  R. 9.  (Citations to the Record shall be by the symbol "R." followed by a page

number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which her disability must have commenced in order to receive DIB under Title II, is December 31, 2010.  R. 946.

Plaintiff's applications were denied initially on January 5, 2007, and upon reconsideration on June 8, 2007.  R. 9.  On August 9, 2007, Plaintiff requested a hearing.  *Id.*  On June 3, 2009, in Ocala, Florida, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Mary C. Montanus.  R. 9, 27-59, 1178-1210.  Robert C. Bradley, an impartial vocational expert, testified during the hearing.  *Id.*  Plaintiff was represented by David M. Lopez, an attorney.  R. 9.  (On June 18, 2009, Mr. Lopez provided the ALJ with a post-hearing letter and Memorandum of Law.  R. 4, 185-218.)

On July 29, 2009, the ALJ issued a decision and denied Plaintiff's applications for benefits, concluding that Plaintiff was not disabled.  R. 9-26, 1076-93.  On August 19, 2009, Plaintiff's representative requested the Appeals Council to review ALJ Montanus's Decision.  R. 113-14.  On May 25, 2010, the Appeals Council denied Plaintiff's request for review.  R. 1-5, 1055-59.  On July 23, 2010, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision, assigned case 1:10-cv-00142-MP-GRJ.  On July 27, 2010, while her civil case was pending, Plaintiff filed new applications for DIB and SSI.  R. 1260-70.

In Case 1:10-cv-00142-MP-GRJ, on April 15, 2011, doc. 21, the Commissioner filed an unobjected-to Motion to Remand based on review of the case by agency counsel who requested the Appeals Council to reconsider the Commissioner's decision, doc. 21-1.  After review, the Appeals Council determined that remand was appropriate,

doc. 21-1. It was further represented that "the Appeals Council will remand the case to an ALJ" and "[o]n remand, the ALJ will further evaluate Plaintiff's mental functioning, and specifically determine whether her condition meets or equals any listed impairment at step three of the sequential evaluation process." *Id.* On April 18, 2011, U.S. Magistrate Judge Gary R. Jones recommended that the case be reversed and remanded pursuant to sentence four of 42 U.S.C § 405(g) to the Commissioner. Doc. 22; R. 1062-63. The recommendation was adopted by U.S. Senior District Judge Maurice M. Paul on May 23, 2011, and the case was remanded to the Commissioner. Doc. 23; R. 1064-66.

On July 15, 2011, the Appeals Council vacated ALJ Montanus's Decision and remanded the matter to an ALJ with instructions. R. 1067-71, 1097-98.

> The hearing decision indicates that the claimant has the "severe" mental impairment of borderline intellectual functioning; however, the decision did not rate the severity of the claimant's borderline intellectual functioning under the special technique in relation to any mental category. For example, the decision did not consider whether the claimant's mental impairment equaled the requirements of Listing 12.02 ["organic mental disorders"]. Further evaluation of the claimant's mental impairment is required.

> Upon remand, the [ALJ] will:

> - Update the evidence on the claimant's medical condition consistent with the guidelines in 20 CFR 404.1512 and 416.912 and in light of any medical development undertaken in connection with the subsequent application.

> - Make further findings about the claimant's mental impairment at step three of the sequential evaluation process. This should include an evaluation of the claimant's borderline intellectual functioning in accordance with Listing 12.02 and the special technique described in 20 CFR 404.1520a and 416.920a. In so doing document application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- Obtain evidence from a medical expert to clarify the nature and severity of the claimant's mental impairments (20 CFR 404.1527(f) and 416.927(f)) and Social Security Ruling 96-6p).

The Appeals Council noted that Plaintiff filed a claim for DIB on July 21, 2010, and that its action with respect to the current claims rendered the subsequent claim a duplicate. The ALJ was directed to "associate the claim files and issue a new decision on the associated claims." R. 1097-98; *see* R. 1260-70 (Plaintiff's 7/27/2010, DIB and SSI applications).

After remand, on January 12, 2012, ALJ Brendan F. Flanagan held a hearing in Jacksonville, Florida. R. 946, 971-1054. Plaintiff, R. 1001-49, Hershel Goren, M.D., a medical expert (ME), R. 982-1001, and Robert N. Strader, an impartial vocational expert, R. 1049-52, 1170 (Resume), testified. Plaintiff was represented by Pamela C. Dunmore, a non-attorney. R. 973, 975, 1171-73. On March 16, 2012, the ALJ issued an unfavorable decision and Plaintiff did not seek review of this Decision with the Appeals Council. R. 943-70. ALJ Flanagan's Decision became the final decision of the Commissioner on or about May 21, 2012. *Id.* On July 12, 2012, Plaintiff filed a Complaint in this Court. Case No. 1:12-cv-162-MP-CAS, doc.1. The parties filed memoranda of law, docs. 12 and 19, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2010." R. 948.

2. "The claimant has not engaged in substantial gainful activity since May 31, 2006, the alleged onset date." *Id.*

3. "The claimant has the following severe impairments: degenerative disc disease of the cervical spine, bipolar affective disorder, neuropathy, pain disorder, borderline intellectual functioning, or panic attacks." *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 949. The ALJ determined that the claimant did not meet the criteria under Listing 1.04 of the Musculoskeletal System for disorders of the spine and under Listing 12.05 pertaining to Mental Retardation. R. 949-52.

5. "[T]he claimant has the residual functional capacity [RFC] to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant's exertional limitations prevent her from lifting or carrying more than 15 pounds occasionally and 10 pounds frequently. Further exertional limitations allow her to stand and/or walk for a total of six hours throughout a standard workday, and sit for a total of six hours throughout a standard workday. The claimant's postural limitations allow her to perform balancing, stooping, kneeling, crouching, crawling, or the climbing of stairs on an occasional basis. The claimant can never perform tasks that require the use of ropes, ladders, and scaffolds. The claimant can never perform tasks that require reaching above her shoulder with more than 10 pounds. The claimant must also avoid exposure to atmospheric conditions such as fumes, odors, dusts, and gases. The claimant is able to perform simple, routine repetitive, tasks, and concentrate and persist for two-hour segments. The claimant is limited to work that requires only occasional interaction with the public, co-workers and supervisors. Lastly, the claimant is unable to meet fast-paced, high-production demands." R. 952.

6. "The claimant is capable of performing past relevant work" as a hand sander with a SVP of 2 and exertional level of light/unskilled. The ALJ concluded that "the claimant is capable of performing light exertional work with additional restrictions. In comparing the claimant's [RFC] with the physical and mental demands of her past relevant work, the undersigned finds that the claimant is able to perform it as generally performed. The exertional level and mental requirements of this unskilled work is not beyond what the claimant is currently capable of performing. This conclusion is based upon the record and testimony received at the hearing from the claimant, her representative, and the vocational expert." R. 959.

7. "The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2006, through the date of this decision." *Id.*

### III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

    1.    Is the individual currently engaged in substantial gainful activity?

    2.    Does the individual have any severe impairments?[2]

---

[2] An impairment or combination of impairments is considered severe only if it significantly limits the claimant's physical or mental abilities to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); Social Security Ruling (SSR) 85-28. "Basic work activities" means "the abilities and aptitudes necessary to do most jobs" including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, hearing, or handling; capacities for seeing, hearing, speaking; understanding, caring out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(1)-(5), 416.921(b)(1)-(5).

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g), 416. 920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A.  Issues

Plaintiff argues the ALJ erred at step three of the sequential evaluation process by not finding that Plaintiff, who has an IQ score of between 60 and 70 (actual Verbal

(Crystalized) IQ score of 65) and was acknowledged by the ALJ at step two to also be suffering from several severe impairments, meets or equals the criteria in Listing 12.05C, in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  Doc. 12 at 3-19.

The Commissioner responds, in part, that "[a]lthough Plaintiff claims that she meets or equals Listing 12.05C, she based this claim on the flawed testimony of Dr. Goren, who neglected to consider whether Plaintiff had deficits in adaptive functioning and relied exclusively on the presumption that arises when a claimant has an IQ subtest score less than 70, as well as an additional impairment."  Doc 19 at 17.

**B.  The Evidence**

**1.  Plaintiff's Age, Education, Work History, and Daily Activities**

Plaintiff was born in 1963 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  R. 24.  Plaintiff finished the 9th grade and left school in the 10th grade because she was pregnant.  R. 30, 142, 370, 400, 542, 709, 796, 1003, 1503.  She worked from 1991 to 2006 for two different boat companies laminating fiberglass boats, buffing, and building kits for boats.  R. 138, 550, 552, 797-99, 1298, 1503.  Plaintiff reported that she worked from 1995 to 2001 for Hunter Marine as a crew leader in the fabrication of small parts for use in recreational boat construction.  R. 797.  She used models to build small boat parts, and regularly lifted 50 to 75 pounds.  *Id.*

Plaintiff reported that she did some cooking and laundry, passed the examination for her driver's license, although she needed help with the written portion of the examination, drove a car once in a while, could handle a savings account and pay bills, could read and write some, played cards, visited with friends once in a while, and

played sports with her grandchild.  R. 37, 146-48, 565, 804, 951, 1004, 1007, 1009-10, 1014-19, 1025, 1034-37, 1315-18, 1502-04; *see* R. 949-51, 954-55.

After she injured her back at work in October 2002 while using a buffing and sanding machine, she filed a Workers' Compensation claim, which netted an award of $208,732.56 after attorney fees.  R. 1271.  Plaintiff returned to work the day after her injury and worked until May 31, 2006, but has not worked since then, R. 137, 550-55, 798, although in November 2006, she told Lance I. Chodosh, M.D., that she had also done farm work and other unskilled labor jobs.  R. 364.  She told Rick Robinson, M.Ed., M.B.A., during an assessment that she had done farm labor from 1988 to 1995.  R. 797.

### 2.  The Medical Evidence

As noted above, on July 29, 2009, ALJ Montanus rendered the first decision in this matter.  R. 9-26.  ALJ Montanus provided a summary of the medical evidence from approximately 2002 when Plaintiff was injured at work through 2009.  R. 14-23.  ALJ Flanagan also discussed relevant medical evidence for similar time periods, but extended his discussion into 2011.  R. 955-58.  Plaintiff does not dispute ALJ Flanagan's findings.  Doc. 12.  As a result, ALJ Flanagan's findings regarding the medical evidence are incorporated by reference herein.  R. 949-59.  Rather, Plaintiff argues that she is disabled because her Verbal (Crystalized) IQ score of 65 *coupled* with the ALJ's finding at step two that Plaintiff has several severe impairments demonstrates that she has an impairment or combination of impairments that meets or medically equals the severity of Listing 12.05C.  Aside from referencing the severe impairments found at step two, Plaintiff relies almost exclusively on the testimony of

Dr. Goren as it relates to Plaintiff's Verbal (Crystalized) IQ score of 65 and how several

of her severe impairments demonstrate she meets the criteria of Listing 12.05C.  Doc.

12 at 7-19.

### 3.  Substantial Evidence Supports the ALJ's Determination that Plaintiff's Impairments do not Meet or Equal the Criteria of Listing 12.05C

At step three, the ALJ determined that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the criteria of Listing

12.05C.  R. 949-52.  In making this determination, the ALJ considered the criteria of

Listing 12.05C (Mental Retardation) (and Listing 12.05A, B, and D, not applicable here)

in conjunction with other medical evidence and Plaintiff's daily activities and behavior.

*Id.  See generally* Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986); Henderson v.

Astrue, 401 F.App'x 449 (11th Cir. 2010) (unpublished).

> Generally, the claimant meets the criteria for presumptive disability under section 12.05(b) when the claimant presents a valid IQ score of 59 or less, or under section 12.05(c) when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.  *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (a valid IQ score need not be conclusive of mental retardation, where the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior).

Crayton v. Callahan, 120 F.3d1217, 1219-20 (11th Cir. 1997); *see* Henry v. Barnhart,

156 F. App'x 171, 173 (11th Cir. 2005) (unpublished) (citing Popp).

The claimant has the burden of proving that her impairments meet or equal a

listed impairment by presentation of specific evidence of medical signs, symptoms, or

laboratory test results meeting all of the specified medical criteria.  Sullivan v. Zebley,

493 U.S. 521, 530 (1990).  "For a claimant to show that his impairment matches a

listing, it must meet *all* of the specified medical criteria. An impairment that manifest

only some of those criteria, no matter how severely, does not qualify." *Id.*

Listing 12.05C provides in relevant part:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intelligence functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.05C. Listing 12.00D.6.c. provides in

part: "In cases where more than one IQ is customarily derived from the test

administered, e.g., where verbal, performance, and full scale IQs are provided in the

Wechsler series, we use the lower of these in conjunction with 12.05."

"If a claimant has been able to adapt in functioning after age 22, it is permissible

to find that Listing 12.05C has not been met." Monroe v. Astrue, 726 F. Supp. 2d 1349,

1355 (N.D. Fla. 2010). The court in Monroe explains:

In an unpublished case, the Eleventh Circuit has recast the rule of *Popp*: to meet Listing 12.05(C), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have [current] deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22." *Pettus v. Astrue*, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (not selected for publication in the Federal Reporter, No. 06-15667). However, it has been pointed out that: "Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be 'deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22.' 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05." *Cammon v. Astrue*, 2009 U.S. Dist. LEXIS 92293, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (No. CIV. A. 3:08-CV-0131-JFK).

*Id*. at 1355 n.5. Further,

> The caselaw addressing the "adaptive functioning" aspect of Listing 12.05C suggests that the adaptive functioning must be significantly inconsistent with the I.Q. score. An ability to do simple daily activities and simple jobs is not enough. As noted in *Lowery*, in *Popp* the court sustained the ALJ's rejection of a claim of equivalency to Listing 12.05C because the claimant's I.Q. score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher." 979 F.2d at 837, citing *Popp*, 779 F.2d at 1499. Additionally, there was evidence in *Popp* that the claimant had "tended to place himself in a very unfavorable light," thereby rendering the personality test scores (the MMPI, not the I.Q. test) invalid in the opinion of the examiner. *Popp*, 779 F.2d at 1498-1499, 1500.

> *Popp* is perhaps the strongest case for finding that an I.Q. score below 70 does not necessarily meet Listing 12.05C. There are several others with facts somewhat like *Popp*. *Bischoff v. Astrue*, 2008 U.S. Dist. LEXIS 79534, 2008 WL 4541118 (S.D. Fla. Oct 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met. The court noted that while the claimant's I.Q. scores were lower than 70, the claimant had previously worked as a parts manager and as an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years. *Id*., at *20. There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training. *Id*.

*Id*. at 1355. As noted in <u>Monroe</u>, a different result was reached in <u>Durham v. Apfel</u>, 34

F. Supp. 2d 1373 (N.D. Ga. 1998), and where the court held:

> Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual. 34 F.Supp.2d at 1380. Distinguishing *Popp*, the court said:

> Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade. *Id. See also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability

to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the I.Q. scores) (citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room.").

Monroe, 726 F. Supp. 2d at 1356-57; *see also* Willis v. Astrue, No. 5:12cv/RS/CJK, 2012 WL 6725605 (N.D. Fla. Nov. 26, 2012).

The ALJ made several findings in his step three analysis. R. 949-52. Before setting forth these findings, the context of these findings, especially as they relate to consideration of Plaintiff's one IQ score, is critical as Plaintiff relies heavily on testing results performed by Mr. Robinson on April 29, 2009. R. 796-811.

On April 29, 2009, Plaintiff was referred by her attorney for a vocational rehabilitation assessment by Mr. Robinson, a consultant in work rehabilitation. *Id.* Mr. Robinson provides a detailed report. *Id.* Mr. Robinson administered the Wide Range Intelligence Test (WRIT) that

is used to evaluate multiple abilities using a three level model of cognitive strength and weakness. At the first level, the instrument yields a measure of general IQ. At the 2nd level, the instrument yields measures of 2 broad based domains of intellectual ability-verbal and visual intelligence. At the 3rd level, the instrument yields measures on 4 subtests of intellectual ability. For this administration, results are referenced to persons age 45:0-48:11." R. 806. Relevant here, Plaintiff's "Verbal (Crystalized)" IQ was "65"; "Percent 1"; "CI 60-74"; and "Profile Very Low."

R. 806. (The Visual (Fluid) and General IQ scores were 85 and 71, respectively. *Id.*)

Mr. Robinson makes no further mention of the IQ scores.[3]

---

[3]  On October 13, 2010, at the request of the Office of Disability Determination, Plaintiff was examined by Janet K. Humphreys, Ph. D., for a psychological evaluation to rule out disabling psychological condition. R. 1502-06. Dr. Humphreys makes numerous observations and some are discussed by the ALJ. *See* R. 954-55. Relevant here, Dr. Humphreys states: "A recent estimate of her intellectual functioning using the

Mr. Robinson also provided a "Social Security Analysis" and used the five-step sequential evaluation framework.  R. 806.  At step three, Mr. Robinson stated:

> Based upon a comprehensive review of medical records and review of the medical listing impairments, it does not appear that [Plaintiff's] impairments meet or equal a listing level impairment.  However, since this consultant is not a medical physician, this opinion is not to be interpreted as providing a medical opinion, but simply a lay interpretation of the facts in record contrasted with regulatory guidance criteria.

R. 807.  Mr. Robinson ultimately concluded that Plaintiff "has a high probability of a favorable award of social security disability benefits for the presently pending claim."  R. 811.

At step three, the ALJ considered Plaintiff's IQ test, citing to page 11 of Mr. Robinson's report, R. 806, and stated: "As to the IQ test itself, the report does not make any assessment of the validity of the test (Exhibit 34F, page 11) and one of the claimant's treating physicians [Dr. Gedney] flatly contradicts its finding."  R. 950.  After discussing relevant evidence regarding the IQ score, the ALJ states: "In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.*  For the sake of completeness, the ALJ's findings at step three that relate to Listing 12.05C are set forth below.  Also, the ALJ's findings regarding Plaintiff's RFC are discussed herein in so far as the ALJ's findings also support his determination in step three that Plaintiff does not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Listing 12.05C.

---

[WRIT] yielded a General IQ of 71."  R. 1502.  Dr. Humphreys refers to Mr. Robinson's 2009 assessment and apparently this IQ score is derived from his assessment.  R. 806.  Dr. Humphreys does not refer to other IQ scores.  R. 1502-06.

The claimant's mental impairment has been considered under the requirements of listing 12.05. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.

At the hearing. Dr. Goren testified that the claimant met listing 12.05C.[4] However. Dr. Goren is mistaken in his belief that a verbal IQ score of 65 coupled with another impairment equals the listing. Dr. Goren's opinion is flawed because listing 12.05C requires several steps. First, the record must demonstrate significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. Second, the record must demonstrate an IQ of 60-70. Lastly, the record or testimony must demonstrate an impairment imposing an additional and significant work related limitation of function.

In the present case, there is no evidence that shows significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. Indeed, there is no evidence of deficits in the development period. Moreover, claimant has a demonstrated history of remarkably good adaptive functioning. In fact, the record describes her prior occupations wherein she worked full time at different jobs (Exhibit 34F, pages 2-4). In one job, the claimant had to select parts in a stock room by using alphanumeric indicators. In another job, the claimant was the leader of a crew and was responsible for making sure the parts were manufactured correctly (Exhibit 42F).[5] These jobs show significant capabilities and functioning.

---

[4] Dr. Goren testified that Plaintiff met Listing 12.05C based, in part, on the verbal IQ of 65 appearing in Mr. Robinson's report. R. 806, 985, 992, 996. He did not have Plaintiff's childhood records and knew only that she was in special education classes. R. 985, 1000. The April 2009 reported IQ score was the earliest record he had, R. 996-97, and the only IQ test he had, R. 1001. Dr. Goren was not aware of "what the word crystallized means" referring to that term used by Mr. Robinson. R. 806; 999-1000.

[5] Exhibits 34F, R. 796-822, and Exhibit 42F, pages 1384-1410, are Mr. Robinson's evaluation and attachments. Mr. Robinson describes Plaintiff's work history that includes working as a crew leader from 1995 to 2001--fabricating of small parts for use in recreational boat construction. R. 797. Plaintiff also reported working, for the same employer (Monterey Boats), first as a Mold Finisher from February 2002 through May 2002 and then, in light duty as a Kit Builder after being injured in October 2002. She worked in this capacity, 40 to 50 hours a week, until May 2006 when she was terminated. According to Plaintiff, she "'missed too many days' and '[she] couldn't perform [her] job.'" R. 798-99; *see* R. 807 (past relevant work-SVP, skill level, and PDC).

*As to the IQ test itself, the report does not make any assessment of the validity of the test (Exhibit 34F, page 11) and one of the claimant's treating physicians flatly contradicts its finding.  On June 12, 2008, Dr. Gedney stated that claimant did not have a "low IQ or reduced intellectual functioning" (Exhibit 16F, page 3)* [R. 451]. *Dr. Gedney had made a similar entry after examining the claimant on February 6, 2007, when he described the claimant's intelligence, global executive function, insight, and judgment as "normal" (Exhibit 10F)* [R. 399].  In May 2009, Dr. Gedney described the claimant as having only a "moderate" level of dysfunction in April 2009 (Exhibit 36F) [R. 864-65 (GAF score "of about 60 or 65")].

The undersigned also notes that on November 29, 2006, Dr. Abeles, a licensed psychologist, examined the claimant and concluded "the claimant's presentation is suggestive of Borderline intellectual functioning," and that "with appropriate treatment, it is likely that she would be capable of obtaining and maintaining employment" (Exhibit 7F) [R. 370-71].  Such findings do not support the conclusion that the claimant exhibited significantly sub-average general intellectual functioning with deficits in adaptive functioning that were initially manifested during the developmental period.

Thus, the undersigned accords little weight to Dr. Goren's testimony that the claimant equaled listing 12.05C.  There [is] no evidence establishing that the claimant's impairment manifested itself prior to age 22 and the claimant's work history shows the ability to perform a variety of mental tasks that required significant cognitive abilities.  *Further, the validity of the IQ test is undermined by the opinion of the treating physician, Dr. Gedney.*

The requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.  In this case, these requirements are not met because the claimant testified she could maintain her personal hygiene, dress herself, prepare simple meals, drive a car, shop, and watch television.

Turning to the requirements in paragraph B, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.  The only IQ score in the record does not meet this requirement.

*In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.*

Finally, the requirements in paragraph D are met if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of

the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. On May 11, 2007, Dr. Bee reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 13F). During a February 6, 2007, evaluation, Dr. Gedney noted the claimant was limited in her daily living activities because of physical pain symptoms and not because of her mental impairments (Exhibit 10F). Dr. Goren testified the claimant had mild limitations in this area prior to April 29, 2009. At the hearing, the claimant testified she could drive, prepare simple meals, and shop. On October 13, 2010, Dr. Humphreys noted the claimant could shop, cook, perform household chores, and care for her personal needs most of the time (Exhibit 46F). On October 28, 2010, Dr. Butler reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 47F). On March 18, 2011, Dr. Levasseur reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 54F).

In social functioning, the claimant has moderate difficulties. On May 11, 2007, Dr. Bee reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 13F). Dr. Goren testified the claimant had moderate limitations in this area prior to April 29, 2009. At the hearing, the claimant testified that she is married and lives with her husband. On October 13, 2010, Dr. Humphreys noted the claimant "visits friends once or twice a week" and shops (Exhibit 46F). Such testimony and statements indicate the claimant is capable of maintaining relationships and acting in a socially appropriate manner. On October 28, 2010, Dr. Butler reviewed the record and concluded the claimant had no limitations in this area (Exhibit 47F). On March 18, 2011, Dr. Levasseur reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 54F).

With regard to concentration, persistence or pace, the claimant has moderate difficulties. On May 11, 2007, Dr. Bee reviewed the record and concluded the claimant had moderate limitations in this area (Exhibit 13F). Dr. Goren testified the claimant had moderate limitations in this area prior to April 29, 2009. Dr. Humphreys concluded the claimant's concentration and memory "may impact her ability to carry out complex instructions" (Exhibit 46F). Such a conclusion is in keeping with the undersigned's assessment limiting her to simple tasks. On October 28, 2010, Dr. Butler reviewed the record and concluded the claimant had mild limitations in this area (Exhibit 47F). On March 18, 2011, Dr. Levasseur reviewed the record and concluded the claimant had moderate limitations in this area (Exhibit 54F). Further, the claimant's overall

appearance and conduct at the hearing indicates that she is capable of sustaining her attention and concentration sufficiently long enough to permit the timely and appropriate completion of simple, routine, repetitive tasks that require her to maintain her attention and concentration for two-hour periods.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Dr. Goren testified the claimant has not experienced any episodes of decompensation which have been of an extended duration. On October 28, 2010, Dr. Butler reviewed the record and concluded the claimant had not experienced any episodes of decompensation of an extended duration (Exhibit 47F). On March 18, 2011, Dr. Levasseur reviewed the record and concluded the claimant had not experienced any episodes of decompensation (Exhibit 54F).

Accordingly, the requirements in paragraph D are not satisfied.

The limitations identified in the "paragraph B" ("paragraph D" criteria of listing 12.05) criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

R. 949-52 (emphasis added).

Among other evidence considered, the ALJ also considered Plaintiff's Verbal IQ

score when he determined her RFC. R. 953.

At the January 12, 2012, hearing, Hershel Goren, M.D., a board-certified neurologist and psychiatrist, testified (Exhibit 32B). According to Dr. Goren, the claimant had cervical and lumbar spine pain, bipolar affective disorder, mental retardation, panic attacks, pain disorder associated with general medical condition, and pathological seclusiveness. Dr. Goren testified that the claimant's impairments equaled listing 12.05C as of April 20, 2009. Dr. Goren based this upon an April 20, 2009, IQ test (Exhibit 34F), which he said was the earliest record he had. Dr. Goren acknowledged that there were no childhood records, or additional IQ testing but added that the record referenced that the claimant was in special education classes. Asked what formed the basis of his conclusion that the claimant had an additional significant limitation, Dr. Goren stated that the assigned GAF scores and other records were evidence of significant work-

related limitations.  Dr. Goren acknowledged that the file did not contain the claimant's childhood education records.

Asked about the IQ score, Dr. Goren stated he did not know what the word "crystallized" meant in reference to the IQ score.  Dr. Goren stated that no other IQ scores existed in the record.

R. 953.

Based on the emphasized portion of the ALJ's reported findings at step three, the ALJ questioned the validity of the IQ score.  R. 950.  In her memorandum, Plaintiff asserts that she meets Listing 12.05C, in part, because she "has an IQ between 60 and 70" and further suggests that "[t]he substantial evidence in the record shows Plaintiff FRAME has a valid performance IQ between 60 and 70."  Doc. 12 at 7-8.  Plaintiff does not discuss the nature of this evidence, however, nor does she complain that the ALJ's findings questioning the validity of the IQ score are not supported by substantial evidence.  Doc. 12.  Rather, Plaintiff assumes the validity of the Verbal IQ score of 65 and concludes that based on this score and the ALJ's findings at step 2 regarding her severe impairments, that she meets Listing 12.05C.  Doc. 12 at 10-11.  At this point, Plaintiff quotes from Dr. Goren's hearing testimony and no other evidence.  Doc. 12 at 7-18.[6]

The Commissioner essentially assumes that Plaintiff had a valid Verbal IQ score of 65 and, based on cited Eleventh Circuit cases, proceeds to discuss the evidence of record that "rebut[s] the presumption of impairment of adaptive functioning based on an IQ score."  Doc. 19 at 19.  The Commissioner also notes that "it is well-settled in the

---

[6]  As noted above, the Court must determine, in part, whether the Commissioner's decision, here the ALJ's decision, is supported by substantial evidence. <u>Chester v. Bowen</u>, 792 F.2d at 131.  The issue is not whether substantial evidence supports Plaintiff's position.

Eleventh Circuit that a valid IQ score must be considered with other evidence in the record." Doc. 19 at 20.

"To establish a disability under section [Listing] 12.05(c), a claimant must present evidence of a valid verbal, performance, or full-scale I.Q. score between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function." Lowery v. Sullivan, 979 F.2d at 837 (citations omitted). Plaintiff did not prove she had a valid IQ score to satisfy the first part of this requirement and, as a result, Plaintiff did not prove that the ALJ erred when he found she did not meet Listing 12.05C.

In Monroe v. Astrue, the ALJ made inconsistent findings regarding the validity of the claimant's IQ score. 726 F.Supp.2d at 1353-54. The psychologist who administered the tests said the scores were valid. *Id.* The court concluded "that the only conclusion as to the validity of the scores that could have been made on this record is that the scores were valid." *Id.* Here, there is no evidence that Plaintiff's IQ score is valid either from Mr. Robinson, the person who administered the test, or from any other source. In Thomas v. Barnhart, 2004 WL 3366150 (11th Cir. Dec. 7, 2004), a case cited in Monroe v. Astrue, there was significant evidence that the claimant's IQ score of 69 was valid, whereas there was testimony regarding a second IQ score of 73 that indicated the claimant's major problems were physical, not his ability to do work-related activities as they related to the capacity for understanding and memory, sustained concentration and persistence, and that his social interaction was good. The court stated that the ALJ did not set out in detail how, if at all, the claimant's behavior and daily activities were inconsistent with his IQ score of 69 and the ALJ did not reject or

determine that the claimant's IQ score of 69 was inconclusive of mental retardation. 2004 WL 3366150, at* 3. The court reversed and remanded the case to the ALJ to properly consider the claimant's IQ score of 69. *Id.*

Here, the ALJ considered Plaintiff's IQ score, found it was discredited, R. 950, and thoroughly discussed Plaintiff's behavior, daily activities, adaptive functioning, and the nature and severity of Plaintiff's physical and other mental impairments.

The burden is on the claimant to prove that she is disabled. Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987). The third-step of the five-step process requires the ALJ to compare the claimant's medical evidence to a list of impairments "presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. at 525. If the medical evidence meets or equals the listing, then a finding of disability is made. *Id.* The claimant's impairments must meet or equal *all* of the specified medical criteria in a particular listing for the claimant to be found disabled at step three of the sequential evaluation process. *Id.* at 530-31.

Even if Plaintiff's IQ score of 65 were valid, the Eleventh Circuit has held that the Commissioner may present evidence of Plaintiff's daily functioning to rebut the presumption of impairment of adaptive functioning based on an IQ score. *See, e.g.,* Lowery v. Sullivan, 979 F.2d at 837. A valid IQ score must be considered with other evidence in the record.

At step three (and when determining Plaintiff's RFC,) the ALJ made many findings supporting his conclusion that

> no evidence shows significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental

period. Indeed, there is no evidence of deficits, in the development period. Moreover, the claimant has a demonstrated history of remarkably good adaptive functioning. In fact, the record describes her prior occupations wherein she worked full time at different jobs (Exhibit 34F, pages 2-4) [R. 797-99].

R.949; *see* R. 952-58 (ALJ's RFC findings).[7]

The ALJ observed that Plaintiff was able to pass a driver's license examination, although she needed help with the written portion of the examination, drive a car once in a while, cook some and do laundry, shop for groceries, play cards, pay bills, count change, use a checkbook or money orders, handle a savings account, read some, visit friends once in a while, and play sports with a grandchild. R. 37, 146-48, 565, 804, 951, 1004, 1007, 1009-10, 1014-19, 1025, 1034-37, 1502-04; *see* R. 949-51, 954-55. The ALJ reasonably found that Plaintiff did not have deficits in adaptive functioning that demonstrated mental retardation. In arriving at this conclusion, the ALJ also noted that medical providers who examined Plaintiff found that she had borderline intelligence, which is a higher level of intellectual functioning than mental retardation. R. 950.[8]

Mr. Robinson, who administered the only IQ testing of record, found that Plaintiff had borderline intelligence, which was an indication that he thought Plaintiff was not

---

[7] Plaintiff does not argue that the ALJ erred in making his RFC assessment. Doc. 12. Plaintiff relies almost exclusively on Dr. Goren's hearing testimony to support her argument that she meets the criteria under Listing 12.05C, other than having a Verbal (Crystalized) IQ score of 65. Simply, put, the ALJ considered Dr. Goren's testimony and "with the exception of [his] erroneous application of 12.05C, the [RFC] assessment comports with his testimony." R. 955. As explained by the ALJ, "Dr. Goren's conclusions as to both the claimant's physical and psychological limitations are accounted for in the" ALJ's RFC assessment." *Id.*

[8] The ALJ stated that Dr. Gedney found that Plaintiff did not have a low IQ or reduced intellectual functioning and Dr. Abeles found that Plaintiff's presentation was suggestive of borderline intellectual functioning. *Id.*

mentally retarded. Furthermore, Plaintiff's Global Assessment of Functioning (GAF)

scores showed, for the most part, only moderate to mild limitations of functioning.

Several health care providers provided GAF scores, including Dr. Abeles (GAF score of

55 in November 2006, R. 370); Dr. Gedney (GAF score of 55 in February 2007, R. 403,

595, and 60 to 65, in April 2009, R. 403, 864, and probably as high as 70 at some point

in time since he began treating Plaintiff, R. 403, 900); and Dr. Sanchez (GAF score of

70 in June 2007, R. 586, 650). Dr. Gedney, during a deposition, testified that in 2002,

prior to her work injury and based on Plaintiff's "reported history," Plaintiff's GAF score

was "somewhere in the area of 75, which is generally a normal level of functioning,"

although he did not see her at that time. R.403, 864, 878-79.[9]

---

[9] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF scale rating of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF scale rating of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors and no more than slight impairment in social, occupational, or school functioning. *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a

Here, the ALJ also considered Plaintiff's physical and mental impairments to determine whether they imposed "an additional and significant work-related limitation of function," Listing 12.05C, when he considered Plaintiff's RFC. R. 952-58; *see supra* n.7 (Plaintiff does not challenge ALJ's RFC assessment and findings). The ALJ considered Plaintiff's testimony regarding her impairments and symptoms and why they prevented her from maintaining employment. R. 953-54. The ALJ found Plaintiff to not be credible concerning her statements regarding the intensity, persistence, and limiting effects of her symptoms. R. 954. The ALJ then summarized the medical evidence. R. 954-58. The ALJ states, in part, that "with the exception of Dr. Goren's erroneous application of 12.05C, the [RFC] assessment comports with his testimony. As outlined above, Dr. Goren's conclusions as to both the claimant's physical and psychological limitations are accounted for in the undersigned's [RFC] assessment." R. 855. Toward the end of his RFC findings, the ALJ states:

> Lastly, the undersigned has considered the combined effects of claimant's impairments and that they can be greater than each of the impairments considered separately. These impairments have been considered when assessing the claim *under the listings* and other steps of the sequential evaluation process, including when assessing the claimant's [RFC]. The undersigned concludes the above [RFC] assessment is supported by medical evidence and testimony of the vocational expert.

R. 958 (emphasis added). In summary, substantial evidence supports the ALJ's rejection of Dr. Goren's opinion that Plaintiff met the criteria of Listing 12.05C.

Based on the foregoing, substantial evidence supports the ALJ's determination that Plaintiff did not satisfy Listing 12.05C because she did not have a valid verbal, performance or full scale IQ of 60 through 70; a physical or other mental impairment

---

global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

imposing an additional and significant work-related limitation of function; and further that

Plaintiff did not have significantly sub-average general intellectual functioning with

deficits in adaptive functioning initially manifested during her developmental period.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are based upon

substantial evidence in the record and the ALJ correctly followed the law.  Accordingly,

pursuant to 42 U.S.C § 405(g), it is respectfully recommended that the decision of the

Commissioner to deny Plaintiff's applications for Social Security benefits should be

**AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on August 12, 2013.


s/  Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**